ELAINE BURK, SHARON GEIGER, CONNIE FARIA, nka CON-
NIE HARRIS, JUANITA HELENIHI, SHARON L. BOYLE,
LOURDES GASPER, AUDREY GARCIA, ISABELLA MEDEI-
ROS, YONORA NOBLE, and JENNIFER MUNDON, individu-
ally and on behalf of all others similarly situated,
Plaintiffs-Appellees, *v.* FRANKLIN SUNN, in his capacity as
Director of the Department of Social Services and Housing, State of
Hawaii, and DEPARTMENT OF SOCIAL SERVICES AND
HOUSING, of the State of Hawaii, Defendants-Appellants

NO. 10061

(CIVIL NO. 7245)

AUGUST 7, 1985

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI AND WAKATSUKI, JJ.

## OPINION OF THE COURT BY LUM, C.J.

This is an appeal by the State of Hawaii, Department of Social Services and Housing ("the Department") from a judgment of the circuit court which invalidated certain administrative rules promulgated by the Department in 1981 and ordered the Department to reinstate certain public welfare benefits for the period from October 1, 1981 to July 19, 1982.

The original complaint against the Department was filed in October 1981 by eight individual recipients of public assistance whose benefits were reduced or terminated on the basis of new eligibility rules issued by the Department in September 1981 which were to become effective on October 1, 1981 ("the October rules"). Plaintiffs contended these rules were invalid because they were not promulgated in accordance with the Hawaii Administrative Procedure Act ("HAPA"), Hawaii Revised Statutes ("HRS"), Chapter 91. After this suit was instituted, the Department issued another, similar set of rules which were to become effective on November 2, 1981 ("the November rules") and Plaintiffs subsequently amended their complaint to include a challenge to the validity of these rules as well. The case was certified as a class action, with the class identified as all residents of the state whose public assistance benefits were reduced or terminated on the basis of the subject rules

The October and November rules changed eligibility requirements for two major public assistance programs: Aid to Families with Dependent Children ("AFDC"), including its associated medical assistance program ("Medicaid"), and Food Stamps. These changes were mandated by the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub. L. No. 97-35, 95 Stat. 357, which sought to reduce federal expenditures in these programs by restricting benefits to the most needy persons. OBRA was enacted on August 13, 1981 and many of its provisions were to become effective on October 1, 1981. *See, e.g.,* OBRA § 2321, 95 Stat.

at 859 (AFDC program). This did not allow sufficient time for the federal agencies involved in the administration of these programs to follow the ordinary rule making procedures under 5 U.S.C. § 553, so they immediately proceeded to issue interim rules pursuant to § 553(b)(B). The Social Security Administration ("SSA") of the Department of Health and Human Services issued interim rules for the AFDC program on September 21, 1981, 46 Fed. Reg. 46,750, and the Food and Nutrition Service ("FNS") of the Department of Agriculture issued interim rules for the Food Stamp program on September 4, 1981, 46 Fed. Reg. 44,712. These rules described the changes which state agencies were required to make to these programs as a result of the passage of OBRA, in order to continue to qualify for federal funding.

The October rules were the Department's first attempt to institute these changes. The Department made no attempt to comply with HAPA when it issued these rules. It simply distributed the new rules to its staff and to some persons and organizations outside the Department. This procedure for making rules without compliance with HAPA was established in 1977 in a consent agreement between the Department and a group of public welfare recipients who had filed suit in 1976 to challenge some new rules issued by the Department. The consent agreement purported to provide for and allow, *in futuro,* the issuance of new rules by the Department in certain circumstances even if not done in accordance with HAPA.

After Plaintiffs filed this suit challenging the October rules, the Department, as a cautionary measure, decided to re-promulgate the rules in accordance with HAPA. Rather than following the time-consuming notice and hearing procedure described in HRS § 91-3(a), however, the Department decided to issue the rules pursuant to §91-3(d) which states, in pertinent part, that

> [the public notice and hearing requirements of § 91-3(a)] may be waived by the governor ... whenever a state ... agency is required by federal provisions to promulgate rules as a condition to receiving federal funds *and such agency is allowed no discretion in interpreting such federal provisions as to the rules required to be promulgated;* provided that the agency shall make such adoption, amendment, or repeal known to the public by publishing a statement of the substance of the proposed rule at least once in a newspaper of general circulation in the State prior to the waiver of the governor . . . . (Emphasis added.)

The Department published the notice required by this section, obtained the governor's waiver, and proceeded to issue the November rules.

During the pendency of this suit, the Department promulgated another set of similar rules under the standard notice and hearing provisions of § 91-3(a). These rules became effective on July 20, 1982 and their validity has not been challenged. It is therefore undisputed that these OBRA-mandated reforms were in place by July 20, 1982. The issue is whether the Department's earlier attempts to make these changes — namely, the October and November rules — were effective.

### A.

With respect to the October rules, the Department concedes that they were not promulgated in accordance with HAPA and they are therefore invalid and unenforceable unless, as the Department urges, Plaintiffs-Appellees are equitably estopped to challenge the validity of these rules because of the 1977 consent agreement. That agreement was declared void *ab initio* as contrary to public policy in *Koolauloa Welfare Rights Group v. Chang*, 65 Haw. 341, 344, 652 P.2d 185, 187 (1982). The circuit court in the instant case determined that the consent agreement did not serve to estop Plaintiffs-Appellees from challenging the validity of the October rules, and we affirm that decision. The October rules are, therefore, a nullity.

### B.

The November rules present a more complex issue. Plaintiffs-Appellees contended, and the circuit court agreed, that the Department was allowed significant discretion in formulating some of these rules and therefore the Department could not utilize the abbreviated rule making procedure set forth in § 91-3(d).

The November rules consisted of twenty-six separate provisions. Two of these were of a general nature, stating the purpose and effect of the rules. Of the remaining twenty-four rules, seven applied to financial assistance under the AFDC program, five concerned Medicaid, and twelve related to the Food Stamp program. Of these twenty-four rules, the circuit court found that nine involved the exercise of discretion by the Department. We now examine these nine rules, looking first at the pertinent portions of OBRA and the federal implementing regulations,

and then at the rules formulated by the Department in response to these federal provisions.

### 1. *The 150 Percent Income Limit*

OBRA imposed a requirement that a state plan for the AFDC program must "provide that no family shall be eligible for aid under the plan for any month if, for that month, the total income of the family (other than payments under the plan), without application of paragraph (8),[1] exceeds 150 percent of the State's standard of need for a family of the same composition." OBRA § 2303, 95 Stat. at 845 (codified at 42 U.S.C. § 602(a)(18)). The implementing interim rule issued by SSA said that the state plan must "provide that no assistance unit is eligible for aid in any month in which the unit's income exceeds 150 percent of the State's need standard for a family of the same composition (other than the assistance payment), without application of the disregards." 46 Fed. Reg. 46,764 (1981) (codified at 45 C.F.R. § 233.20(a)(3)(xiii)). This was a categorically new requirement for eligibility under the AFDC program; previously there was no limit on the amount of gross income a family could have and still be eligible for AFDC.[2] *See* 46 Fed. Reg. 46,753 (1981).

In response to this federal mandate, the Department formulated the following rule:

> *Income limit for AFDC eligibility.* No applicant or recipient shall be eligible for financial assistance in the aid to families with dependent children category for any month if the total gross income of the family exceeds 150 percent of the budgeted standard for a family of the same composition. "Income" is defined as earned and unearned income and includes money received for labor, services, investments,

---

[1] "Paragraph (8)" refers to § 402(a)(8) of the Social Security Act, 42 U.S.C. § 602(a)(8), which enumerates several types of income which must be disregarded when determining eligibility for assistance. These "disregards" provide an incentive for recipients to obtain employment and include, *e.g.,* any income earned by a dependent child who is also a student, the first $75 of income earned each month by any member of the family, and earned income which is used to pay child care expenses.

[2] Eligibility depended, of course, on the amount of income and resources which the family had *after* applying the disregards. The 150 percent income rule reflects a determination by the Congress that when a family's income -- including the disregards -- reaches a certain level, that family should not receive assistance payments.

and financial aid from public and private organizations.

Hawaii Public Welfare Manual ("HPWM") § 17-1085-4 (1981). Clearly the Department had no discretion in setting the percentage involved in this rule: the federal statute and regulation unequivocally required that the limit be established at 150 percent, no more and no less. The Department's rule, however, includes a definition of "income" and refers to a "budgeted standard." The issue is whether these aspects of the rule reflect the exercise of discretion by the Department.

*Income.* The federal provisions do not define "income." In response to comments received concerning this rule, SSA stated that "[g]ross income is all earned and unearned income that the State counts in determining need and the amount of the assistance payment without application of the disregards." 47 Fed. Reg. 5652-53 (1982). Thus it appears that the states are given some discretion in deciding what shall be counted as income for purposes of this program. If, however, the Department's definition of "income" in § 17-1085-4 is nothing more than a restatement of its pre-existing definition, then the Department did not exercise any discretion by merely including the definition in its new rule. If, on the other hand, this definition represents a change from the prior definition, then the Department may have exercised some discretion here.

From a careful review of the record, we are unable to conclude that this definition of "income" is a change from the Department's prior definition. Appellees, as Plaintiffs below, had the burden of showing that the Department exercised its discretion in formulating this definition. This burden could have been met by showing, for example, that this definition includes some type of income which previously was not considered by the Department. Plaintiffs-Appellees made no such showing. Insofar as the record reveals, this definition is no more inclusive than prior definitions used by the Department. We therefore find that no discretion was exercised by the Department in this regard.

*Need Standard.* The federal statute and regulation refer to the state's "standard of need for a family of the same composition." In order to understand the issue raised by the Department's use of a "budgeted standard" in this context, it will be helpful to review certain aspects of the AFDC program.

A state plan for AFDC must specify a statewide standard, expressed in money amounts, to be used in determining the need of applicants and recipients, and the amount of the assistance payment. 45 C.F.R.

§ 233.20(a)(2)(i). This "standard of need" is the amount of money which has been determined to be essential to maintain an acceptable standard of living. The states, however, are not required to make payments equal to their standards of need; rather, they are permitted to set payment levels at a percentage of the need standard. 45 C.F.R. § 233.20(a)(2)(ii). The purpose of setting a "standard of need" is not, therefore, to ensure that the benefits paid will be sufficient to provide for basic subsistence. Rather, the standard of need serves as a benchmark against which the adequacy of payments may be measured. The Supreme Court explained the function of the standard of need by saying that,

> while [the Social Security Act] leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable.

*Rosado v. Wyman,* 397 U.S. 397, 413 (1970). The State of Hawaii has not exercised the option of reducing assistance payments to some percentage of its standard of need. Benefit levels in Hawaii, therefore, purport to be sufficient to meet its need standard.

The standard of need in Hawaii is determined pursuant to HRS § 346-53 (Supp. 1984) and consists of two parts: a basic needs allowance and a shelter allowance  The basic needs allowance is intended to cover all usual recurring living expenses excluding housing, utilities, and medical care  *See* HPWM § 3303 (1976). The maximum amount of this allowance was set by statute in 1975, with a provision that it may be increased periodically to reflect increases in wages and prices in the state. HRS § 346-53(b). The statute further provides that the recipient shall receive the maximum amount of the basic needs allowance provided that "his needs are not reduced by his income or resources." *Id.* The amount of the shelter allowance, which is intended to cover rent and utilities, is determined by a statutory schedule according to the number of persons in the assistance unit. HRS § 346-53(d). The statute provides that the allowance "shall be for cost paid, up to the maximum as provided in the schedule." *Id.* Under this scheme, therefore, a recipient will receive the maximum basic needs allowance, unless offset by his income and resources, and in addition will receive the actual amount of his shelter costs, up to the scheduled maximum.

In order to apply the 150 percent income limit rule, the Department

must determine the family's standard of need. For a family who receives the maximum basic needs allowance and the maximum shelter allowance, this calculation is unproblematic: the Department simply adds the amounts of the two allowances. For a family whose actual shelter costs are less than the maximum shelter allowance, however, the question arises as to whether its "standard of need" should be determined with reference to the maximum shelter allowance payable to a family of the same size, or the actual amount of the shelter allowance that family receives. In other words, is the "need standard" the maximum amount payable to a family of a given composition, or is it the amount payable to a particular family given its actual shelter costs? The budgeted standard which the Department incorporated into § 17-1085-4 refers to the actual amount of the shelter allowance which that family receives. The use of this "budgeted standard" rather than the maximum standard means that fewer families will be eligible for AFDC assistance.[1]

The federal provisions refer to the "standard of need for a family of the same composition." This language plainly indicates that the "standard of need" is the standard applicable to a hypothetical family composed of a given number of persons, and the mere fact that a particular family has actual shelter costs which are less than the amount specified as the standard does not necessarily mean that that family has a lower "standard of need." If the Congress had written the statute with refer-

---

[1]To illustrate the difference, consider two hypothetical families, each of which consists of four persons. The only difference in the families is that family A has actual monthly shelter costs of $275, whereas family B has actual monthly shelter costs of only $115. Using the most current information in the record regarding the maximum allowable amount of the two allowances, family A could receive as much as $281 per month for basic needs and $265 per month for shelter, a total of $546. Family B, on the other hand, could receive no more than $396 of assistance monthly ($281 + 115).

If the "standard of need" is construed to mean the maximum amount of assistance payable to a family of four persons, then the standard for both families is $546, and neither family would be ineligible for assistance unless its gross income exceeds $819 ($546 × 150%). Under the provisions of § 17-1085-4, however, which defines "standard of need" in relation to actual shelter costs, family B will be ineligible for assistance if its gross monthly income exceeds $594 ($396 × 150%). This means that because its actual shelter costs are $150 less than the maximum allowable, the gross income limit for family B is reduced by $225.

Thus, if family A has gross monthly income of exactly $819 (so that after paying its actual shelter costs, it still has $544 of disposable income), it nevertheless could be entitled to the maximum assistance amount of $546, whereas if family B has gross monthly income of $595 (so that after paying its actual monthly shelter costs, it has only $480 of disposable income), it is ineligible for any assistance.

ence to the standard of need *for that particular family,* then it could be argued with some force that the standard should include only the amount of that family's actual shelter costs. We must presume, however, that when the drafters of OBRA used the words, "for a family of the same composition," they meant something by those words. It certainly appears to us that they intended that the "standard of need" for purposes of this rule be that standard which is applicable to any family of a given number of persons, regardless of whether the particular family under consideration has actual shelter costs which are less than the amount specified by that standard.

For purposes of this case, however, we need not — and we do not — decide which of these interpretations is preferable. If we assume that the more restrictive interpretation advanced by the Department is at least reasonable, then we must conclude that the statute is open to varying interpretations and the Department necessarily exercised its discretion in adopting one rather than another. This is the very type of situation that the public hearings normally required by HRS § 91-3(a) are meant to address. HRS § 91-3(d), which dispenses with these hearing requirements, is by its terms limited to situations in which the Department "is allowed no discretion in interpreting [the] federal provisions as to the rules required to be promulgated." By its use of a "budgeted standard" in § 17-1085-4, the Department has demonstrated that this is not such a situation.

### 2. *Disregards from Earned Income for AFDC Financial Assistance*

OBRA changed the provisions relating to "disregards" of earned income for the AFDC program. One such change was to mandate a disregard of earned income which is used to meet actual costs incurred for the care of a dependent child or incapacitated adult, up to a maximum of $160 per month. OBRA § 2301, 95 Stat. at 843 (codified at 42 U.S.C. § 602(a)(8)(A)(iii)). Although the interim regulation issued by SSA unequivocally stated that the maximum amount which may be disregarded is $160 per month *for each dependent,* 46 Fed. Reg. 46,765 (codified at 45 C.F.R. § 233.20(a)(11)(i)(C)), the rule adopted by the Department is unclear as to whether this disregard is limited to $160 for each dependent or for each family: the regulation merely says to "subtract an amount not exceeding $160 a month for care of a dependent child or an incapacitated individual living in the same household and receiving AFDC." HPWM § 17-1085-5.

Although Plaintiffs-Appellees may be correct in their observation that § 17-1085-5 is ambiguous in this respect, the Department submits that it has never interpreted its rule to mean that this disregard is limited to $160 per family, and there is nothing in the record to suggest that the Department has ever so interpreted it. In other words, the rule formulated by the Department could be interpreted in a way that would clearly contravene the federal provisions, although the Department has apparently never done so. Under these circumstances, we cannot say that the Department was allowed any discretion in formulating this rule.

### 3: *Budgeting of Nonrecurring Payments*

Prior to the enactment of OBRA, if a family received some amount of nonrecurring income, such as retroactive Social Security benefits or an insurance settlement, this amount was counted as income in the month of receipt and considered to be a resource in the following months to the extent that it was retained. OBRA introduced a new rule that when a family receives such income, exceeding the state's standard of need for that family, the family will be ineligible for aid for the number of full months derived by dividing the total amount of the income by the need standard. OBRA § 2304, 95 Stat. at 845 (codified at 42 U.S.C. § 602(a)(17)). In effect, families now are required to budget such income to meet their future needs; they cannot simply spend the entire amount during the month of receipt and therefore become eligible for assistance again the following month.

Plaintiffs-Appellees contend the Department had the discretion to provide in its rule that the period of ineligibility may be shortened if a portion of the lump-sum income was used in connection with life-threatening circumstances. However, the interim federal regulations issued by SSA in September 1981 did not give the states this flexibility. In its discussion of the interim rules, SSA stated that "[t]here is . . . no waiver or good cause provision which can be applied to reduce the period of ineligibility." 46 Fed. Reg. 46,755. We therefore find that the Department was not allowed any discretion in formulating this rule.

It is true that the final regulations issued by SSA in February 1982 changed this rule so that "[a] State may shorten the period of ineligibility where it finds that a life-threatening circumstance exists, and the nonrecurring income causing the period of ineligibility has been or will be expended in connection with the life-threatening circumstance." 47 Fed.

Reg. 5675 (now codified with further amendments at 45 C.F.R. § 233.20 (a)(3)(ii)(F)). The Department, however, did not have this option at the time it was drafting the November rules.

### 4. *Personal Reserve Standard for AFDC Financial Assistance*

OBRA set statutory limits for the first time on the amount of resources a family may have and still be eligible for AFDC. Prior to this time, resource limits were established by regulation. The new statute provided that the state "shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1000 *or such lower amount as the State may determine.*" OBRA § 2302, 95 Stat. at 844 (codified at 42 U.S.C. § 602(a)(7)(B)) (emphasis added). The federal interim regulation said that "[t]he amount of real and personal property that can be reserved for each assistance unit shall not be in excess of one thousand dollars equity value (or such lesser amount as the State specifies in its State plan)." 46 Fed. Reg. 46,763 (codified at 45 C.F.R. § 233.20(a)(3)(i)(B)).

In response to these federal provisions, the Department formulated the following rule:

> *Personal reserve standard for AFDC applicants and recipients.* An individual or family shall be eligible for financial assistance under the aid to families with dependent children category if the total value of cash held on hand, cash in checking account, savings account, or time deposits, liquid assets, including cash value of life insurance policies, equity value of any automobile in excess of the exemption in § 17-1085-8, and equity value of any real property not used as a home, exceeds the following amounts:

| Family Size | Amount |
|:---:|:---:|
| 1 | $ 445 |
| 2 | 585 |
| 3 | 700 |
| 4 | 820 |
| 5 | 940 |
| 6 or more | 1,000 |

HPWM § 17-1085-7. It is obvious that the Department was allowed discretion in setting the amounts of the personal reserve limit. The federal provisions merely set $1000 as the maximum, and the Department decided to set lower limits for families of less than six persons.

### 5. *Automobile Exemption for AFDC Financial Assistance*

OBRA also provided that the state shall not include as a resource, for purposes of the personal reserve standard, "so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary [of Health and Human Services] may pre-scribe." OBRA § 2302, 95 Stat. at 845 (codified at 42 U.S.C. § 602(a)(7) (B)). The interim regulation issued by SSA specified that the state must exclude from consideration "[o]ne automobile, up to $1500 of equity value or such lower limit as the State may specify in the State plan." 46 Fed. Reg. 46,763 (codified at 45 C.F.R. § 233.20(a)(3)(i)(2)). The regula-tion further provided that "[e]quity value means fair market value minus encumbrances (legal debts); fair market value means the price an item of a particular make, model, size, material or condition will sell for on the open market in the geographic area involved." 46 Fed. Reg. 46,764 (codified at 45 C.F.R. § 233.20(a)(3)(ii)).

The Department's rule exempted $1500 equity in one automobile, the maximum amount permitted by the federal regulation. The Depart-ment's rule also provided that "[t]he fair market value of the automobile shall be determined by considering: (A) The Kelley blue book retail value; (B) Newspaper advertisements for the same make, model, size and condition of the automobile; or (C) Opinions of value by qualified automobile appraisers." HPWM § 17-1085-8(b)(11).

Although the federal provisions would have permitted the Depart-ment to set the automobile equity limit at an amount less than $1500, the Department did not do so. Consequently we find that the Department effectively waived the discretion given it under the federal provisions, and this regulation therefore could properly be promulgated under HRS § 91-3(d).

Plaintiffs-Appellees also contend that the Department's adoption of retail value for automobiles was discretionary, however the federal regulation required that the automobile be valued at its selling price on the open market. Hence the Department did not exercise discretion in this regard.

### 6. *Disregards from Earned Income for AFDC Medical Assistance*

This rule, relating to the medical assistance program for AFDC families, is identical to the rule for AFDC financial assistance, discussed

*supra.* Again, Plaintiffs-Appellees argue that the rule is unclear as to whether the disregard for dependent care expenses is limited to $160 per month for each dependent or for each family, and for the same reasons previously given, we find that the Department exercised no discretion in this regard.

### 7. *Personal Reserve Standard for AFDC Medical Assistance*

This rule for the AFDC medical assistance program is similar to the rule relating to the personal reserve standard for AFDC financial assistance, discussed *supra.* In this rule, however, the Department did not set personal reserve limits less than $1000 for families of less than six persons. Rather, the Department's rule allows a personal reserve of $1000 for all assistance units, the maximum permitted by the federal provisions. HPWM § 17-1085-29. We therefore find that the Department waived its discretionary power to set lower limits, and this rule is suitable for promulgation under the provisions of HRS § 91-3(d).

### 8. *Automobile Exemption for AFDC Medical Assistance*

This rule is identical to the rule relating to the automobile exemption for the AFDC financial assistance program, discussed *supra,* and for the same reasons we find that the Department exercised no discretion in formulating this rule.

### 9. *Proration of Food Stamps*

OBRA imposed a new requirement that the Food Stamp program prorate benefits for the initial month of application. Previously, applicants could receive benefits for the entire month even if they did not apply until sometime later in the month. Under the new rule, the amount of benefits awarded for the first month must be prorated from the date of the application. OBRA § 110, 95 Stat. at 361 (codified at 7 U.S.C. § 2017 (c)). The interim rule issued by FNS provided that the states could use either a 30-day standard month or the exact number of days in a month for purposes of proration. 46 Fed. Reg. 44,725 (codified at 7 C.F.R. § 273.10(a)(1)(ii)).

The Department decided to use a 30-day standard month. HPWM § 17-1085-54(b)(1). Persons who apply for Food Stamps during months

having 31 days receive a lesser amount of benefits under this system than if the Department had chosen to use the exact number of days in the month.[4] The Department attempts to justify its promulgation of this rule without the ordinary notice and hearing procedures by arguing that the choice is one of internal management and not subject to rule-making. HRS § 91-1(4) (1976) states that the term "rule" as used in HAPA "does not include regulations concerning *only* the internal management of an agency *and* not affecting the private rights of . . . the public" (emphasis added). In *Aguiar v. Hawaii Housing Authority,* 55 Haw. 478, 489, 522 P.2d 1255, 1263 (1974), we discussed this provision of HAPA and noted that where the agency's action has a direct effect on the private rights of members of the public, the degree to which that action concerns "only" internal management becomes irrelevant. Plainly, the Department's choice of a 30-day standard month has a direct impact on the rights of Food Stamp recipients and therefore this is a "rule" within the meaning of HAPA. It is clear that the Department was given the discretion to prorate benefits under either system.

To summarize the foregoing, we find that the Department exercised discretion with respect to only three of the twenty-six November rules: the 150 percent income limit, the personal reserve standard for AFDC financial assistance, and the proration of Food Stamps. We therefore affirm the decision of the circuit court that these three rules are invalid.

A further question which remains for our consideration is what relief should be provided in this situation. The circuit court found that nine of the November rules involved discretion and on that basis it invalidated the entire set of twenty-six rules. We do not believe, however, that it was necessary or appropriate for the court to go that far. It is apparent that the rules are generally separable and the fact that a few of them are invalid does not mean that they are all infirm. We therefore hold that the November rules, with the exception of the three we have determined to be discretionary, are valid and enforceable inasmuch as they were properly promulgated under the provisions of HRS § 91-3(d).

The remaining issues raised by the Department in this appeal are without merit and do not warrant discussion. The case is affirmed in

[4]For example, if a person applies for benefits on the 25th day of a month having 31 days, and a full month's benefits amount to $100, he will receive $20 using the 30-day standard month, but would receive $23 using the exact number of days in the month.

94

part, reversed in part, and remanded to the circuit court for further proceedings consistent with this opinion.

*Thomas D. Farrell,* Deputy Attorney General, for Defendants-Appellants.

*Ben H. Gaddis (Brenton Rogozen* with him on the brief), Legal Aid Society of Hawaii, for Plaintiffs-Appellees.