
IN THE MATTER OF PETITIONS FOR RULEMAKING,
N.J.A.C. 10:82–1.2 AND 10:85–4.1.

Argued January 18, 1989—Decided December 11, 1989.

*David G. Sciarra,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate of New Jersey (*Alfred A. Slocum,* Public Advocate, attorney).

*Douglas S. Eakeley* argued the cause for *amici curiae* American Baptist Churches of New Jersey, et al. (see Appendix A for the complete list of *amici curiae*) (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Laura J. Berkowitz,* on the brief).

*Robert T. Pickett* argued the cause for *amicus curiae* New Jersey Black Issues Convention, Inc.

*William Harla,* Assistant Attorney General, argued the cause for appellant Department of Human Services (*Cary Edwards,* Attorney General of New Jersey, attorney; *Dennis J. Conklin,* Deputy Attorney General, on the briefs).

*Melville D. Miller, Jr.,* President, Legal Services of New Jersey, Inc., argued the cause for respondents, Jan Harris, Gwen De Palma, Bernadette Gaskill, Alexandria Rippey, Evelyn Chudley, Delthine Jenkins, Ida Bell, Ruby Grace, Jerry Albright, Fannie Tift, Phyllis Wilson, Walter Zoolkoski, Janie Davis, J.P., George Storms, Donald Kain, G.W., M.W., and Russell Watson (*Melville D. Miller; Hugh D. Heisler,* Acting

Executive Director, Essex–Newark Legal Services; *Timothy K. Madden,* Director, Hudson County Legal Services; *John D. Atlas,* Executive Director, Passaic County Legal Aid Society; *John F. Rhody,* Executive Director, Ocean–Monmouth Legal Services, Inc.; *Patrick N. Budd,* Director, Legal Aid Society of Mercer County; *Diane K. Smith,* Executive Director, Somerset–Sussex Legal Services Corp.; *William F. Matrician,* Legal Director, Legal Aid Society of Morris County, attorneys; *Melville D. Miller, Joseph Harris David,* and *Ted Gardner,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This appeal primarily concerns the proper relationship between courts and administrative agencies in the effectuation of programs delegated to the agency by the legislative branch. The issue arises in the context of a judicial order that the New Jersey Department of Human Services (DHS) set forth a standard of need by which to assess the benefit levels of two major public-assistance programs that the agency administers. These programs are Aid to Families With Dependent Children (AFDC), set up under *N.J.S.A.* 44:10–1 to –8, and the General Public Assistance Law (GA), *N.J.S.A.* 44:8–107 to –157. The difference in programs (aside from funding sources) is that the AFDC program serves only families with children in need while the GA program is the program of "last resort" for many needy citizens not qualifying for categorical welfare aid, such as Old Age Assistance, Aid to the Blind, Disability Assistance, Aid to Families with Dependent Children, or Aid to Families of the Working Poor. The AFDC program is a joint federal and state program involving 50% federal money and 50% non-federal money, consisting in New Jersey of 35% state money and 15% county money. The GA program is funded entirely through non-federal sources and currently is funded 75% by state money and 25% by municipal money. *See Williams v. Department of Human Servs.,* 116 *N.J.* 102, 105 n. 1 (1989).

██ The issues in this case are narrow. The questions are not whether there is a constitutional or a statutory entitlement to a certain level of benefits, but only whether the agency must establish, by a proper administrative process, what level of benefits would be required to maintain the recipients in the measure of dignity that the enabling legislation contemplates. Nor is there a question of constitutional intrusion on the separate powers of the other branches of government. We seek here only to do the Legislature's will. Should we err in our judgment of the Legislature's intent, the matter may be resolved, at least at the state level, by a line in the legislation.

Finally, we recognize the unavoidable circularity in the process. The agency contends that such a process is futile because in the long run the standard of need will provide benefits only on paper; the actual level of benefits will be those that the Legislature establishes in the annual Appropriations Act. Still, we find that there is a sufficient mandate to the agencies in each of the enabling acts that the development of such a standard be not regarded as futile. Hence, we affirm the judgment of the Appellate Division, which directed DHS to conform to the express or implied policy of the enabling acts by requiring development of standards of need.

I

The procedural history of the case is set forth in DHS' petition for certification. On December 19, 1985, two class petitions for rulemaking were filed with the Department of Human Services pursuant to *N.J.S.A.* 52:14B–4(f) and *N.J.A.C.* 1:30–3.6. 18 *N.J.R.* 1622 (Aug. 4, 1986). These regulations allow any person to petition an agency to promulgate, amend or repeal any rule.

The petitions were filed on behalf of all recipients of welfare benefits from the AFDC program and the GA program. The Commissioner of Human Services perceives the petitions as demanding that he (1) increase the existing federally-mandated

standard in the AFDC program, and (2) create a similar standard in the GA program. Claimants on behalf of AFDC recipients described their petition as seeking "a rule raising welfare benefits and establishing a level of assistance that is required by the New Jersey statutes and Constitution, and is 'compatible with decency and health.'" (Quoting *N.J.S.A.* 44:10-1(a)(1)). The Public Advocate joined in the petitions. The petitioners presented extensive documentation in support of their claims, primarily consisting of recipients' affidavits of need and monographs questioning the adequacy of existing welfare benefits.

Initially, the Department noted its intention to comply with the petitions and conduct such a rulemaking proceeding, but on July 15, 1986, the Commissioner issued a response denying the relief sought in the petitions. The Commissioner's findings may be summarized as follows: (1) the existing regulations satisfy federal requirements concerning a standard of need in the AFDC program, (2) a standard of need is not required in the non-federal GA program, or (3) an index of need independent of payment schedules that are tied to legislative appropriations would serve no useful purpose to the program, and (4) in any event the amounts reflected in the payment schedules of the welfare programs do not comprise the full range of available benefits and thus should not be "measured in isolation." 18 *N.J.R.* 1622 (Aug. 4, 1986).

The claimants appealed the denial to the Appellate Division, which reversed the denial of their petitions and remanded to the Commissioner for further proceedings consistent with its finding that "it is the statutory obligation of the Commissioner of Human Services of the State of New Jersey * * * to establish a 'standard of need' based upon the actual cost of basic necessities in New Jersey." *In the Matter of Petitions for Rulemaking N.J.A.C. 10:82–1.2 and 10:85–4.1,* 223 *N.J.Super.* 453, 455 (1988). The court held that under this State's welfare statutes, *N.J.S.A.* 44:8–107 and 44:10-1, the Legislature has mandated a standard of need to advise it of appropriations needed for the welfare programs. 223 *N.J.Super.* at 460. The DHS petition

■■■■■■■■■■

for certification asserts that the statutes relied on by the court do not include such a requirement. The court, however, found a mandate for the setting of such standards to be implicit in the legislation. Critical to that finding is the Appellate Division's determination that in the absence of an index set by the Commissioner, the Legislature cannot effectively decide on appropriations for the welfare programs in this state. *Ibid.* We granted the petition of the Commissioner of Human Services to review that decision. 111 *N.J.* 638 (1988).

## II

The economic background to the case is perhaps best seen in the collaborative report of the Association for Children of New Jersey and the Junior Leagues of New Jersey and the Governor's Committee on Children's Services Planning. T. Fagan & S. Geismar, *Abandoned Dreams: New Jersey's Children in Crisis* (undated). We do not intend in any sense to validate these data, inasmuch as that will occur only in the agency process. We assume the source to have sufficient reliability for us to assay the social context.

The report concludes that in New Jersey today, children represent 40% of the poor. Non-white children are four times more likely to live in poverty than are white children. Although children represent only 27% of the total population, they represent close to half—277,000—of the people living in poverty in New Jersey. Contrary to popular belief, most poor families do not have large numbers of children. In New Jersey, the average family size is 3-⅓ people. The average size of a poor family is 3-½ people. Minority families with children in New Jersey are over four times more likely than white families with children to be poor. Almost 30% of all black families and 21% of all Hispanic families with children live in poverty.

A family of four receiving the *maximum* AFDC grant gets $443 a month. Even with a full food stamp allotment of $183, this family has less than 60% of the minimum cost of living in

New Jersey. While the cost of living in New Jersey increased by over 130% between 1975 and 1985, AFDC payments increased by only 33% during the same period.

We recognize that these data are not entirely current but they represent the background against which the petitioners sought this relief.

The causes for this disparity between needs and benefits are complex. It has been suggested that a national commitment to the primacy of social security has diminished the resources available for needs-based programs. *See generally* Simon, "Rights and Redistribution in the Welfare System," 38 *Stan.L. Rev.* 1431 (1986) (arguing that a substantive rights theme has inhibited national redistribution efforts). For example, social security benefits increased by 10% in 1971, by 20% in 1972, and by 7% in 1973, and were indexed, effective 1975, by a formula that "immunized them from the runaway inflation of the late 1970s." *Id.* at 1465. In contrast, most states allowed their public assistance standards to erode through inflation: "The real value of AFDC payment standards declined by an average of 17% during the 1970s." *Ibid.* "[T]he devastating truth is that few States, if any, define need at, much less above, the poverty level." *Tello v. McMahon*, 677 *F.Supp.* 1436, 1445 (E.D.Cal.1988). Under the national administration's 1981 budgets, "[f]ood stamps would have been cut in half and AFDC by more than a quarter, while social security would have been cut by only 10 percent." Simon, *supra*, 38 *Stan.L.Rev.* at 1465. In short, "the protection of social insurance [social security] seems to have come at the expense of public assistance." *Id.* at 1466. In addition, the "normative priority" given to social security has "contributed to the political isolation of the poor." *Ibid.* It is not for us to weigh these policy choices, but only to note their effects.

### III

With this as economic background, we turn to the legal issues. To understand the legal issues, it is necessary to

understand the programs. We shall discuss the issues primarily in the context of the AFDC program, since that program has by far the most far-reaching economic and social consequence. In its Appellate Division brief, DHS noted that New Jersey expended $238,197,000 in State funds for the AFDC and GA programs in fiscal year (FY) 1986; of this amount, $184,105,000 was spent for assistance in AFDC (averaging 367,766 recipients per month), and $54,092,000 was spent for assistance in GA (averaging 26,295 recipients per month). In response to the petitions for rulemaking in the instant case, the Department of Human Services, Division of Public Welfare, estimated the cost, in State dollars, of raising the level of benefit in both programs to the federal poverty line. The Division estimated that the cost of such action would be approximately $500,000,000. Hence, we shall focus first on the AFDC issues.

### A.

In part IV of this opinion, *infra* at 324, we explain that our judicial role is limited to determining whether the agency's action or inaction violates express or implied legislative policies. Specifically, the question posed is whether the legislative policies of the State's AFDC program require the agency to develop the "standard of need" by which to measure whether children are receiving the intended benefits of the program.

New Jersey has long elected to participate in the AFDC program. The program appears in our laws of more than fifty years ago. *L.* 1938, *c.* 161. Like the counterpart federal program, the purposes of our Act are:

(1) To provide for the care of eligible dependent children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health,

(2) To help maintain and strengthen family life,

(3) To help such parents or relatives to attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, * * *. [*N.J.S.A.* 44:10–1(a).]

This State mandate to provide care consistent with "standards" of "decency and health" is reinforced by the program of cooperative federalism.

The federal AFDC program is designed to provide financial assistance to needy dependent children and to the parents or relatives who live with and care for them. The principal purpose of the program, as indicated by 42 *U.S.C.* § 601, is to help such parents and relatives "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection * * *." The program "is based on a scheme of cooperative federalism." *King v. Smith,* 392 *U.S.* 309, 316, 88 *S.Ct.* 2128, 2132–33, 20 *L.Ed.*2d 1118, 1125 (1968). As noted, it is financed by the federal government on a matching-fund basis. Under the federal Health and Human Services regulations, all State AFDC plans must comply with federal regulations. To understand the difference in what is at stake in this discussion of the "standard of need" as opposed to the "level of benefits," we draw on a recent discussion by the Hawaii Supreme Court.

> *Need Standard.* The federal statute and regulation [establishing AFDC] refer to the state's "standard of need for a family of the same composition." In order to understand the issue raised by the Department's use of a "budgeted standard" in this context, it will be helpful to review certain aspects of the AFDC program.
>
> A state plan for AFDC must specify a statewide standard, expressed in money amounts, to be used in determining the need of applicants and recipients, and the amount of the assistance payment. 45 C.F.R. § 233.20(a)(2)(i). This "standard of need" is the amount of money which has been determined to be essential to maintain an acceptable standard of living. The states, however, are not required to make payments equal to their standards of need; rather, they are permitted to set payment levels at a percentage of the need standard. 45 C.F.R. § 233.20(a)(2)(ii). The purpose of setting a "standard of need" is not, therefore, to ensure that the benefits paid will be sufficient to provide for basic subsistence. Rather, the standard of need serves as a benchmark against which the adequacy of payments may be measured. The Supreme Court explained the function of the standard of need by saying that,
>
>> while [the Social Security Act] leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political

consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable. [*Burk v. Sunn,* 68 *Haw.* 80, 705 *P.*2d 17, 22 (Haw.1985) (quoting *Rosado v. Wyman,* 397 *U.S.* 397, 413, 90 *S.Ct.* 1207, 1218, 25 *L.Ed.*2d 442, 456 (1970)).]

Moreover, a state cannot obscure what standard of need applies. In *Rosado v. Wyman,* 397 *U.S.* 397, 408, 90 *S.Ct.* 1207, 1215–16, 25 *L.Ed.*2d 442, 453 (1970), a case interpreting 42 *U.S.C.* § 602(a)(23), the provision mandating a one-time adjustment in the standard of need in 1969, the Supreme Court indicated that federal law requires a state to establish a clear "standard of need." The same Court noted that a state may thereafter "pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need." *Rosado v. Wyman, supra,* 397 *U.S.* at 413, 90 *S.Ct.* at 1218, 25 *L.Ed.*2d at 456.

Admittedly, the broad policy of section 602(a)(23) in requiring states to face up to the responsibilities of public assistance has weakened with the passage of time, as Congress has not required additional adjustments to the standard of need. Nevertheless, federal law still requires the state to establish a clear standard, *see Mont v. Heintz,* 849 *F.*2d 704 (2d Cir.1988), and doing so has "practical and political consequences." *Rosado v. Wyman, supra,* 397 *U.S.* at 413, 90 *S.Ct.* at 1218, 25 *L.Ed.*2d at 456.

The practical consequences are also affected by the fact that the standard of need took on greater significance with the enactment of the Omnibus Budget Reconciliation Act of 1981 (OBRA), *Pub.L.* No. 97–35, 95 *Stat.* 357, which in large part became effective October 1, 1981. OBRA declared any household whose gross income exceeded 150% of the state standard of need ineligible for AFDC benefits. OBRA § 2303, 95 *Stat.* at 845 (codified at 42 *U.S.C.* § 602(a)(18)). This section was amended to substitute "185%" by the Deficit Reduction Act of 1984, *Pub.L.* No. 98–369, 98 *Stat.* 494, 1134 § 2621.

█ In short, Congress requires the states to set forth the difference between what people need and what they get. And this difference has practical consequences.

In its Appellate Division brief, the Department stressed what it perceived to be the futility of the process of determining what people need apart from what they will get: "[A]ppellants [welfare claimants] are in the wrong forum. Their plea for increased public assistance is more properly directed toward the Legislature, which alone has the power to grant that relief."

But when we require compliance with law, it is never an idle gesture. In requiring similar compliance, Justice Harlan noted that although Congress had not mandated a *level of appropriations* that a state must make, it had mandated that states must nonetheless determine "the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need * * *." *Rosado v. Wyman, supra,* 397 *U.S.* at 413, 90 *S.Ct.* at 1218, 25 *L.Ed.*2d at 456. In so doing, Congress

embodied in legislation the cost-of-living exercise which has both practical and political consequences. It has the effect of requiring the States to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities * * *. [*Ibid.*] 1

---

1There is some suggestion that the legislation referred to in *Rosado v. Wyman* was a one-shot event in 1968 requiring states to adjust their individual standard of need just once to reflect increases in the cost of living by July 1, 1969. But there is nothing to indicate that the general requirement for a standard of need is not part of the cooperative program. *See Mont v. Heintz, supra,* 849 *F.*2d 704. By letter dated January 11, 1989, the Attorney General informs us that the Family Support Act of 1988, *Pub.L.* No. 100–485, 102 *Stat.* 2343, amends the AFDC sections of the Social Security Act, 42 *U.S.C.* §§ 601 to 617. Section 404 of that act, 102 *Stat.* 2398, amends Section 402 of the Social Security Act (42 *U.S.C.* § 602) to add subsection (h), providing that each State shall reevaluate the need standard and payment standard under its plan at least once in every three years, and report the results of that reevaluation to the Secretary (who shall report to Congress) and the public. The report must state the manner in which the need standard is determined, its relationship to the payment standard, and any changes in either the need standard or the payment standard in the preceding three-year period.

The practical consequences that Justice Harlan foresaw have been realized:

> It is impossible to measure the practical effect of the poverty line, but an interesting argument that need standards had an important progressive effect on public assistance standards is made in *Urban Systems Research and Engineering, AFDC Standards of Need,* 247–84 (Report to the Social Security Administration, August 1980) (on file with author). The report studies the relation between "need standards" (normative standards of need) and "payment standards" (amounts guaranteed to recipients, which are often some fraction of need standards) in state AFDC programs during the 1970s. Both the standards and the relations between them vary enormously among the 50 states. However, the study found a strong positive correlation between the size of increases in payments and the size of the gap between need and payment standards. In both states with relatively generous benefits and those with relatively ungenerous benefits, benefits tended to increase faster where there was a significant distance between the need and payment standards. The authors speculate that, while need standards are highly manipulable, some states took them seriously, and good faith efforts to estimate need often resulted in standards above program payments. These standards in turn, the authors further speculate, exercised a kind of normative pressure on legislators that prompted benefit increases. [Simon, *supra,* 38 *Stan.L.Rev.* at 1489 n. 190.]

Finally, it is a simple fact of human experience needing no empirical demonstration that not until we see the face of poverty do we react to it. The plight of the poor in places such as Appalachia and Ethiopia would have escaped attention were their suffering children not seen.

In short, there is every reason to believe that an informed society will react more humanely than an uninformed. Dickens' fables may represent the reality of human experience. We are not given visions of the future to guide our decisionmaking. We ought at least have a clear vision of the present.

---

The Attorney General also informs us that the Family Support Act mandates two studies regarding AFDC payment standards and benefits. Section 405 of the Act, 102 *Stat.* 2399, directs the Congressional Budget Office to conduct a study regarding the feasibility of establishing a nationwide minimum payment standard. Section 406 directs the Secretary of Health and Human Services to enter into contract with the National Academy of Sciences "for the study of a new national system of welfare benefits for low-income families with children." *Ibid.*

## B.

The General Assistance program does not contain the same clear dichotomy as the AFDC program in separating needs from level of benefits. Yet, the core argument of DHS against developing a standard of need remains the same, namely, that the amount appropriated is the same as the amount of need. The Department argues that *N.J.S.A.* 44:8–124 merely mandates that "[t]he extent of individual grants shall be determined in accordance with the standards and budgets authorized by the commissioner." The Department

> therefore submits that the GA statute mandates no more than the provision of an "appropriate" amount of assistance, and that determination of what assistance is appropriate is committed to the sound discretion of the Commissioner.
>
> Assuming, *arguendo,* that the State AFDC and GA statutes mandate benefit levels in excess of those provided for in the regulations establishing the allowance standards in those programs, those allowance standards are nevertheless valid because the Commissioner has no authority to expend funds for assistance in excess of the amounts appropriated by the Legislature for that purpose.

But that argument misses the point that Justice Harlan emphasized in *Rosado v. Wyman, supra,* 397 *U.S.* 397, 90 *S.Ct.* 1207, 25 *L.Ed.*2d 442, that the establishment of standards is a reasonably necessary exercise even if the resources of government do not allow for fulfillment of the needs.[2]

At least in the case of GA assistance, this exercise will be less futile than might be thought by reason of the necessary evaluation of all other available benefits. As we recently learned in *Williams v. Department of Human Services, supra,* 116 *N.J.* at 118, one of the Department's goals in dealing with the problems of the needy is to make sure that they are fully aware of all available benefit programs. For example, a GA recipient may very well be eligible to receive as well federal

---

[2]There is evidence of the State's increasing concern for the plight of the recipients. In its Appellate Division brief, the State notes: "AFDC allowances were increased 10% in 1974, 5% in 1978, 2.5% in 1979, 7% in 1980, 7% in 1984, 5% in 1985, and 5% in 1987. GA allowances were increased 10% in 1974, 7% in 1984, 5% in 1985, and 5% in 1987."

food stamps and/or supplemental social-security-income benefits, veterans benefits, H.U.D. rental subsidies, or the like.

■ The legislative mandate to the agency surely implies that the agency cannot realistically establish budgets for a GA recipient without knowing what the recipient needs. Exactly how to define a "standard of need" is in itself a debatable proposition. The agency will have a wide measure of discretion in formulating the standard. But the exercise need not be terribly complex. An example of an AFDC budget is given in *Mitchell v. Blinzinger*, 646 *F.Supp.* 66, 68 (N.D.Ind.1986). First, there are expenses for rent or other shelter. Second, there are basic needs, which consist of fixed amounts per person for food, clothing, utilities, and household supplies. Third, usually there are special needs, which are fixed amounts for anticipated but irregular items such as school expenses, household repairs, or the like. A claimant's need for a month is really the total of these shelter expenses, basic needs, and special needs. Anyone who has run a household budget does not have too much difficulty with these figures.

This is not intended to suggest a return to the individualized welfare grants that were in place prior to the 1971 revision of State policy. *See Pascucci v. Vagott*, 71 *N.J.* 40, 45 (1976). In New Jersey we average these needs out as a "flat grant." Nor is anything in this opinion intended to mandate that the Legislature increase the level of benefits in either or both of these programs. Funds for public assistance must come from the same source as those for education, Medicaid, public safety or environmental protection. We realize that balancing competing funding needs is among the most difficult judgments required of the other branches.

IV

■ A final note, then, about the question with which we started: whether the court below has exceeded its proper role in reviewing agency action. We have been the first to recog-

nize that courts have but a limited role to play in reviewing the action of other branches of government. In light of the executive function of administrative agencies, the judicial capacity to review administrative actions is severely limited. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm'n*, 93 *N.J.* 384, 390 (1983). Courts can intervene only in those rare circumstances in which it is clear that the agency action is inconsistent with its mandate. Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. *Campbell v. Department of Civil Serv.*, 39 *N.J.* 556, 562 (1963).

We address again in this case only the first of those factors, *i.e.*, whether the action, or here, inaction, violates the enabling act's express or implied legislative policies. We find implied within the legislative policies of providing assistance for needy people that the Department determine what they need. In this exercise there is no corresponding judicial mandate to raise benefit levels.

In a society of government under law, it remains the province of courts, under their traditional review powers, to determine what are the express or implied legislative policies in an enactment. Naturally, the choice of programs or measures that will implement the policies is for the agencies.' We have consistently held that the agencies have the broadest power in determining how to allocate available resources. *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 370 (1987).

But this is a case involving not the level of benefits or the determination of what benefits will be awarded, but rather

what benefits are needed. In this sense it is similar to our decision in *Texter v. Department of Human Services*, 88 *N.J.* 376 (1982). Obviously, in this administrative process the choice of procedure is left to the discretion of the agency. *Id.* at 385. And the final outcome is almost always for the Legislature. In response to *Texter*, DHS notes, the Legislature declined to appropriate funds for the Medical Assistance for the Aged Program.

In this elaboration of legislative policies courts and agencies need not be regarded as hostile forces. "[A]lthough the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." *United States v. Morgan*, 313 *U.S.* 409, 422, 61 *S.Ct.* 999, 1005, 85 *L.Ed.* 1429, 1435–36 (1941), *cited in* B. Schwartz, *Administrative Law* 20 (1976).

We have no "illusion that a court by judicial fiat can enforce the idealism of poets." *Avant v. Clifford*, 67 *N.J.* 496, 517 (1975). Like that Court, we do not sit here as a super legislature, nor do we concern ourselves with the wisdom of the administrative choices. Rather, we view this matter as within our proper role of deciding questions of legislative intent.

In this respect, citizen suits resemble familiar forms of judicial review of administrative action. Especially in the situation where the private litigant has an ongoing relationship with a regulatory agency * * * judicial review can be viewed as part of a continuing dialogue between the agency and its constituencies over the content of regulatory policy.

[Boyer & Meidinger, "Privatizing Regulatory Enforcement: A Preliminary Assessment of Citizen Suits Under Federal Environmental Laws," 34 *Buffalo L.Rev.* 833, 836 (1985).]

Obviously, here (subject to the parameters of federal law) the substantive content of the policy can be readily resolved by the other two branches of government. In the FY '89 Budget Act, the Legislature specifically stated that a standard of need should be developed by the agency. *L.*1988, *c.* 47. The Governor vetoed this language in the budget, stating that "[t]he

question of a standard of need should be addressed in the context of separate legislation and should not be included within the Appropriations Act, which has a life of but one year." *Ibid.* Thus the two branches appear to differ more over the means by which to address the "standard of need" than over the end itself, the measurement of social need. We note that the State's FY '89 Budget Act seems to contemplate some agency action on standards. The Attorney General has brought to our attention the following provision of the State Appropriations Act for fiscal year 1989, *L.*1988, *c.* 47: "Any change by the Department of Human Services in the standards upon which or from which grants of categorical public assistance are determined first shall be approved by the Director of the Division of Budget and Accounting." FY 1989 Appropriations Handbook, p. C–27.

We agree with DHS that the Legislature does not need DHS' advice about issues so obvious as the ever-increasing cost of subsistence in our society. At the same time, the past agency acquiescence in the overarching authority of the Legislature to establish the level of public-assistance grants does not obviate the conclusion that the enabling legislation reasonably calls for further agency definition of the broad-based statutory standards of the two programs. We do not believe that the Legislature intends that this regulatory process be suspended because it cannot always be implemented. In the last analysis, the extent to which the statutory standards are implemented must be left to the Legislature's judgment. We repeat here, as we did in *Williams, supra,* 116 *N.J.* at 124 and in *Franklin v. New Jersey Department of Human Services,* 111 *N.J.* 1 (1988), the declaration of the rights of these claimants, as furnished by our Governor, "namely that 'all persons, regardless of fault, are entitled to the basic human needs for shelter and food and [that] it is the obligation of government to ensure that these needs are met.'" Report of the Governor's Task Force on the Homeless, Appendix C (Oct.1985), *quoted in Franklin, supra,*

111 *N.J.* at 19. It is hard to conceive how this obligation can be met until the needs are known.

The decision of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN and STEIN and Judges GAULKIN and D'ANNUNZIO—7.

*Opposed*—None.

## APPENDIX A

## COMMUNITY ORGANIZATIONS AND GROUPS WHICH SUPPORT THE STANDARD OF NEED PETITION

1. American Baptist Churches of New Jersey
2. American Civil Liberties Union of New Jersey
3. The American Jewish Committee–New Jersey Area
4. Anthony House
5. Apostles' House
6. Archdiocese of Newark Commission on Peace & Justice
7. Association for Jewish Federations of New Jersey
8. Bergen County Council of Churches
9. Bishop Joseph Mahurter Shelter
10. Camden County Client's Council
11. Camden Metropolitan Ministry
12. Camden Shelter Coalition
13. Casa Prac
14. Catholic Charities, Diocese of Metuchen
15. Center for Food Action in New Jersey
16. Center for Non–Profit Corporations
17. Church Women United Food Pantry
18. Communication Workers of America
19. Community Action Programs Executive Directors Association
20. Community Health Law Project
21. Community Planning & Advocacy Council
22. Concerned Parents for Head Start
23. Consumers League of New Jersey
24. Elizabeth Homeless Coalition
25. El Centro, Catholic Social Services
26. EMMAUS Community of Christian Hope

27. Essex County Client's Council
28. Eva's Kitchen
29. Feminist Action Coalition
30. Good Samaritan Center
31. Health and Welfare Council of Bergen County
32. Hispanic Health & Mental Health Assn. of Southern New Jersey, Inc.
33. Holy Trinity Lutheran Church
34. Housing Coalition of Middlesex County
35. Ironbound Community Corporation
36. La Casa de Don Pedro
37. League of Women Voters of New Jersey
38. Leavenhouse
39. Let's Celebrate
40. Lutheran Social Services of New Jersey
41. National Association of Social Workers Inc.
42. New Jersey Association, Central Atlantic Conference United Church in Christ
43. New Jersey Black Issues Convention
44. New Jersey Council of Churches
45. New Jersey Federation of Senior Citizens, Inc.
46. New Jersey Friends Council
47. New Jersey Impact
48. New Jersey Office of Governmental Ministry
49. New Jersey Synod Executive Board of the Lutheran Church in America
50. New Jersey Tenants Organization
51. New Jersey Synod Social Ministry Committee
52. Philadelphia Yearly Meeting Religious Society of Friends
53. Puerto Rican Congress of New Jersey
54. Religious Coalition for Food
55. Rescue Mission of Trenton, Inc.
56. St. Columba Neighborhood Club
57. St. Luke's Episcopal Church
58. St. Mary's Pantry
59. St. Paul's Ecumenical Shelter for Men
60. Salem Day Care Center & Nursery School, Inc.
61. Sisters of Charity of Saint Elizabeth
62. Social & Political Concerns Committee of the Moorestown Community of Churches
63. Southpark Lighthouse Temple

64. Stella Wright Resident Management Corporation
65. TASK, Inc.
66. Trenton Ecumenical Area Ministry
67. UAW—District 65
68. Union of American Hebrew Congregations
69. The Urban League of Essex County
70. Volunteers of America, Philadelphia–Camden Post
71. Council for Human Services
72. Episcopal Community Service–Newark Diocese
73. The Diocesan Council of the Episcopal Diocese of Newark
74. Lunch Break
75. Shrewsbury Monthly Meeting Religious Society of Friends
76. The Episcopal Churchwomen, Diocese of Newark
77. The North Porch Women and Infants Center
78. State Public Affairs Committee of the New Jersey Junior Leagues (SPAC)
79. The Interfaith Council for the Homeless of Union County
80. AFL–CIO (does not wish legal counsel)
81. The Mental Health Association in New Jersey
82. New Jersey Foster Parents Association
83. Atlantic City Monthly Meeting of the Religious Society of Friends
84. Haddonfield Meeting, Peace and Social Concerns Committee
85. Communications Workers of America Local 1081
86. Camden Lutheran Parish
87. Christ Congregation
88. Camden County Council on Economic Opportunity, Inc.
89. Woodbury Monthly Meeting of the Religious Society of Friends
90. The Synod of the Mid–Atlantics, Reformed Church in America