966 P.2d 619

**Carl FOYTIK, Plaintiff–Appellant,**

v.

**Susan CHANDLER, Director of the Department of Human Services, a duly organized and recognized agency of the State of Hawai'i, Defendant–Appellee.**

No. 20807.

Supreme Court of Hawai'i.

Sept. 15, 1998.

As Amended Oct. 23, 1998.

Carl Foytik, on the briefs, plaintiff-appellant, appearing pro se.

Lisa M. Itomura, Deputy Attorney General, on the briefs, for defendant-appellee.

Patrick Gardner and Wey–Wey Kwok (of the Legal Aid Society of Hawai'i), on the briefs, for amicus curiae Legal Aid Society of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

MOON, Chief Justice.

This case arises out of rules promulgated by the Department of Human Services [hereinafter, DHS or Department] in response to the legislature's 1995 amendments to Hawai'i Revised Statutes (HRS) § 346–71, which concerns general assistance (GA) welfare. The amendments changed GA from an entitlement to a block-grant program and granted DHS some flexibility in setting the amounts of GA benefits and the eligibility criteria. As such, DHS promulgated rules governing, *inter alia,* the nature and implementation of benefit reductions, suspensions, and/or cancellations. More specifically, title 17, DHS, Hawai'i Administrative Rules (HAR) §§ 17–678–17 to 17–678–19 (1995), authorized DHS to set monthly GA allowances, without a public hearing, in order "to avoid an expenditure of funds beyond those appropriated by the legislature of the State of Hawaii for the General Assistance Program." HAR § 17–678–18(a).

Protesting DHS's adjustments of his GA benefits, plaintiff-appellant Carl Foytik, pro se, filed suit against defendant-appellee Susan M. Chandler, Ph.D., Director of DHS, seeking a declaratory judgment that HAR §§ 17–678–17 to 17–678–19 are invalid and unenforceable. Foytik alleged, *inter alia,* the rules were improperly promulgated, in excess of the statutory authority of DHS, and unconstitutional. His complaint was dismissed.

Foytik now appeals from the April 21, 1997 judgment and order granting Chandler's motion to dismiss his complaint and the June 2, 1997 order denying his motion to amend judgment to include reasoned decision. Foy-

tik contends on appeal that: (1) HAR §§ 17–678–17 to 17–678–19 are invalid inasmuch as DHS failed to provide proper notice of public hearing regarding the promulgation of such rules, in violation of the Hawai'i Administrative Procedure Act (HAPA), HRS, chapter 91; (2) the rules fail to establish a method for determining assistance amounts, in violation of Act 166; (3) every adjustment in GA monthly allowance constitutes rulemaking under the HAPA, requiring notice and public comment which DHS failed to provide; and (4) the actual allowances set by DHS were arbitrary and capricious inasmuch as the Department intentionally set the monthly amounts at less than 1/12 of total appropriations in order to maintain a contingency reserve. For reasons discussed *infra* in section IV.C, we hold that HAR §§ 17–678–17 to 17–678–19 contravene the statutory mandate of Act 166 and are therefore invalid and unenforceable. Accordingly, we vacate the judgment and order granting Chandler's motion to dismiss his complaint and remand for further proceedings not inconsistent with this opinion.

## I. *BACKGROUND*

On June 15, 1995, the Governor signed Act 166 into law, amending HRS §§ 346–53 and 346–71, the sections concerning, respectively, determination of amount of assistance and general assistance. 1995 Haw. Sess. L. Act 166, §§ 1–2 at 277–82. The Act provides in relevant part:

SECTION 1. Section 346–53, Hawai'i Revised Statutes, is amended to read as follows:

"§ 346–53 Determination of amount of assistance. (a) *This subsection does not apply to general assistance.* The standard of need for families of given sizes shall equal the poverty level established by the federal government in 1993, pro-rated over a twelve-month period.

[ (b) ] The assistance allowance provided shall be based on a percentage of the standard of need . . . .

*(b) The director shall determine the allowance for general assistance based upon the total amount appropriated for general assistance, among other relevant factors.*

. . . .

(h) The director shall adopt rules pursuant to chapter 91 to implement this section."

SECTION 2. Section 346–71, Hawaii Revised Statutes, is amended to read as follows:

"§ 346–71 General Assistance. (a) The department of human services [shall] *is authorized to* administer and provide public assistance to eligible persons who are disabled[ ] . . . and who are unable to provide sufficient support for themselves . . .

. . . .

(b) A disabled person between eighteen and sixty-five years of age shall be eligible for general assistance[,] *for not more than one year* [ ] . . . .

. . . .

*The one year eligibility under this subsection may be extended by the department pending determination of eligibility for the Federal Supplemental Security Income Program or its successor agency.*

. . . .

*(d) A person between the ages of eighteen and sixty-five years of age whose primary diagnosis is substance abuse shall be eligible for assistance for a period not to exceed six months* . . . .

. . . .

(g) [The] *Within the limitations of this section, the* department shall by rules adopted pursuant to chapter 91, [establish criteria and standards for the foregoing conditions and requirements.] *determine:*

*(1) The allowance for general assistance based upon the total amount appropriated for general assistance;*

*(2) A method for determining assistance amounts; and*

*(3) Other necessary provisions to implement general assistance."*

SECTION 3. Statutory material to be repealed is bracketed. New statutory material is underscored.

SECTION 4. This Act shall take effect on July 1, 1995.

1995 Haw. Sess. L. Act 166, §§ 1–4 at 277–82 (emphasis and brackets in original).[1]

In sum, Act 166 changed HRS § 346–71 from a mandatory eligibility program into a block grant program, leaving DHS with discretion as to how to apply the funds budgeted. *See id.* Whereas the assistance allowance was formerly set at sixty-two and one-half percent of the standard of need, *see* HRS § 346–53(b) (1993), Act 166 provided that DHS, pursuant to HRS §§ 346–53(b) and 346–71(f), would now "determine the allowance for general assistance based upon the total amount appropriated for general assistance," *see* 1995 Haw. Sess. L. Act 166, §§ 1–2 at 277–82. Act 166 further required that, under HRS § 346–71(f), the DHS establish a method for determining assistance amounts by rules promulgated under the HAPA. *See* 1995 Haw. Sess. L. Act 166, § 2 at 282. Act 166 was to take effect on July 1, 1995.

Prior to the enactment of Act 166, DHS, on June 4, 1995, published notice in several Hawai'i newspapers of its intent to hold public hearings on proposed amendments to HAR §§ 17–678–17 to 17–678–19 under the authority of the new statute. Public hearings on the proposed amendments were subsequently held on July 5, 1995. On July 24, 1995, DHS promulgated amendments to HAR §§ 17–678–17 to 17–678–19 pursuant to Act 166. Those rules provide in pertinent part as follows.

BENEFIT REDUCTION PROCEDURES FOR THE GENERAL ASSISTANCE PROGRAM

§ 17–678–17 *General Statement.* This subchapter sets forth the rules to be followed if the monthly benefit amount determined in accordance with section 17–678 are reduced, suspended, or canceled to comply with section 346–53, Hawaii Revised Statutes, as amended.

1. We note that HRS § 346–71(g) of Act 166 was formerly promulgated as HRS § 346–71(f). For the sake of consistency, all references to HRS § 346–71(g) of Act 166 will therefore be to HRS § 346–71(f).

2. Section (c) was amended September 26, 1997 to read:

§ 17–678–18 *Nature of reduction action.* (a) To avoid an expenditure of funds beyond those appropriated by the legislature of the State of Hawaii for the General Assistance Program, action to comply with section 346–53, Hawaii Revised Statutes may include:

(1) Suspension or cancellation of benefits for one or more months;

(2) Reduction in benefits for one or more months; or

(3) Combination of reduction, suspension, and cancellation for one or more months.

(b) If a reduction in benefits is deemed necessary, benefits shall be reduced by reducing the standard of assistance for each household size by the same percentage.

(c) All households affected by a reduction action shall be guaranteed a minimum benefit of $10 unless the action is a:

(1) Cancellation of benefits;

(2) Suspension of benefits; or

(3) Reduction of benefits by ninety percent or more of the prereduction level.[2]

§ 17–678–19 *Implementation of benefit reductions, suspensions, and cancellations.* (a) When the director notifies the department of a decision to reduce the monthly benefits, the date the reduction is to take effect, and the percentage of reduction of the benefit for each household size, the department shall take immediate action to effect the reduction for the affected month, without a public hearing, by:

(1) Making necessary computer adjustments;

(2) Reproducing the benefit amounts as determined by the director and distributing these tables to the issuance staff; and

The following General Assistance households shall not be affected by a reduction action:

(1) Households receiving Refugee Assistance; or

(2) Residents of domiciliary care homes.

(3) Ensuring that all households whose reduced benefits would be less than $10 shall receive a minimum benefit of $10 except as provided in section 17–678–18(c).

DHS also promulgated amendments to HAR § 17–659–11 on July 24, 1995, and then again on December 15, 1995.[3] Under these rules, disabled adults between the ages of eighteen and sixty-five could receive GA for no more than six months. *See supra* note 3.

A. *On May 16, 1996, Foytik Moves To Intervene As A Party In Does v. Chandler, Civ. No. 95–4583–12.*

On December 15, 1995, John Does 1–3 and Jane Does 1–3 (the Does) filed a class action complaint in first circuit court on behalf of GA recipients disabled by causes other than substance abuse between the ages of eighteen and ·sixty-five, naming Chandler and Patricia Murakami, Acting Administrator, Family and Adult Services Division, DHS, as defendants. The case was docketed as *Does v. Chandler,* Civ. No. 95–4583–12 [also referred to herein as *Does* ]. The complaint in *Does* alleged that HAR § 17–659–11's six-month restriction exceeded the authority of the DHS under HRS § 346–71 inasmuch as the statute provided for one year of benefits for recipients disabled by causes other than substance abuse, and DHS had applied the new limit retroactively to recipients starting July 1, 1995, contrary to the statute.

The Does thereafter moved for a preliminary injunction barring enforcement of HAR § 17–659–11 which motion was granted on December 28, 1995. On January 11, 1995, Chandler and Murakami filed an interlocutory appeal to this court from the order granting the Does' motion for preliminary injunction. The appeal was docketed as *Does v. Chandler,* No. 19542.

On May 16, 1996, Foytik, a GA recipient between the ages of eighteen and sixty-five, who was disabled by causes other than substance abuse, moved to intervene as a party in *Does v. Chandler,* Civ. No. 95–4583–12. His motion was granted by the first circuit court on September 10, 1996.

On October 17, 1997, this court vacated and remanded the circuit court's order granting the Does' motion for preliminary injunction. *See Does v. Chandler,* No. 19542, 86 Hawai'i 19, 946 P.2d 973 (Oct. 17, 1997) (sdo). The summary disposition order stated in pertinent part that:

We note that the legal basis of the circuit court's order granting the plaintiffs' motion for a preliminary injunction in this case was its interpretation of Hawai'i Revised Statutes (HRS) § 346–71, as amended on June 14, 1995. Subsequent to the circuit court's order, the legislature has amended HRS § 346–71 three times; on June 19, 1996, *see* 1996 Haw. Sess. L. Act 289, § 2 at 922–25, on June 16, 1997, *see* 1997 Haw. Sess. L. Act 200, § 7 (slip act at 17), and on July 3, 1997, *see* 1997 Haw. Sess. L. Act 354, §§ 1, 3 (slip act at 4). Act 289, by its own terms, is effective retroactive to July 1, 1995. *See* 1996 Haw. Sess. L. Act 289, § 4 at 925. The subsequent amendments were both made effective as of July 1, 1997. *See* 1997 Haw. Sess. L. Act 200, § 11 (slip act at 26); 1997 Haw. Sess. L. Act 354, § 5 (slip act at 8).

Because Act 289 retroactively changed the statutory language upon which the circuit court had earlier relied, the particular rationale used by the court no longer has a

---

**3.** The July 24, 1995 amendments to HAR § 17–659–11 allowed GA recipients whose primary diagnosis is substance abuse to receive benefits for six months, and other disabled adults between the ages of eighteen and sixty-five to receive benefits for one year. These changes were removed by subsequent amendments promulgated on December 15, 1995 which limited all disabled adults to six months of eligibility. As of December 15, 1995, HAR § 17–659–11 provided in relevant part:

*Persons between 18 and 65 applying for or receiving assistance as disabled persons.*

. . . .

(d) Assistance shall be approved if the current medical report establishes that the individual is disabled and the individual is between eighteen and sixty-five years of age and has not received general assistance for a total of six calendar months from July 1, 1995.

(e) Whenever the individual is determined to be disabled, assistance shall be approved only for the duration of the disability and assistance shall not exceed a total of six calendar months from July 1, 1995. . . .

HAR § 17–659–11 (1995) (emphasis in original).

basis in law. Without offering an opinion as to the construction of HRS § 346-71 as amended subsequent to the circuit court's order, we hold that the order must be vacated and this case remanded for further proceedings. Therefore,

IT IS HEREBY ORDERED that the order from which the appeal is taken is vacated and the case is remanded to the circuit court for further proceedings.

Considering that HRS § 346-71 (Supp. 1997) and HAR § 17-659-11 (1997) no longer contain any references to time limitations on GA benefits, the issue of durational eligibility was thereafter effectively mooted. To date, however, there has been no final judgment issued in *Does*.

### B. *On October 16, 1996, Foytik Initiates The Instant Suit*

In the interim, pursuant to HRS § 17-678-19(a), DHS adjusted Foytik's GA benefits beginning in March 1996. Specifically, beginning in March 1996, Foytik's general assistance benefits were reduced from $418 per month to $217 per month. In May 1996, his general assistance benefits were adjusted to $335 per month.

On May 14, 1996, Foytik requested that DHS provide him with a fair hearing to contest its intention to set GA benefit amounts at $268 beginning July 1996. Foytik alleged that the reduction was "a capricious action unsupported by any rule." Denying his request on May 15, 1996, DHS stated in pertinent part that "[t]he sole issue is one of State law requiring automatic grant adjustments for classes of recipients...." From July 1996 until October 1996, Foytik received $268 per month.

On October 16, 1996, Foytik instituted his declaratory judgment suit against Chandler. On November 6, 1996, Chandler filed her motion to dismiss declaratory judgment complaint, arguing that *Does v. Chandler*, Civ. No. 95-4583-12, encompassed the same legal and factual issues as the instant lawsuit, thereby barring the present suit based on the doctrine of res judicata. On November 22, 1996, Foytik filed a "Motion for Declaratory Judgment," submitting numerous exhibits in support thereof. Additionally, Foytik moved on December 12, 1996 to convert Chandler's motion to dismiss into a motion for summary judgment.

Foytik's motion to convert was denied on March 3, 1997. On March 7, 1997, the circuit court heard Foytik's "Motion for Declaratory Judgment" and Chandler's motion to dismiss, during which time Chandler called Kristine M. Foster, Acting Income Maintenance Management Office Administrator for the Family and Adult Services Division, DHS, to testify regarding the method by which DHS sets GA benefit amounts. Foster had drafted and was responsible for the implementation of HAR §§ 17-678-17 to 17-678-19; her affidavit was submitted in support of Chandler's motion to dismiss. According to Foster's affidavit:

e. Benefit amounts are adjusted by looking at the current and anticipated population requiring assistance within the fiscal year and the amount of allocation remaining. We then determine a benefit amount which would allow us to spend the maximum amount of the allocation without running out of money before June 30 of the year. If all funds are expended prior to June 30, we would be forced to stop the program until a new allocation is received on July 1 of the next fiscal year.

f. This process is complicated by three factors:

First, the actual population is unknown until two months after the month in which benefits are issued. This is because the rules allow 45 days to process an application. For example, if an applicant applies on May 1 and is found eligible on June 15, benefits would then be issued for the full month of May and the full month of June on June 15.

Second, payments are made at the beginning of the month for the current month. To change the payment amount, the computers must be reprogrammed two months prior to the checks being issued. For example, to change checks for May, the amount to [sic] issued must be known no later than March 15.

Lastly, the lower the standard, the less people that qualify for benefits. When

benefits are decreased, the population decreases. This results in additional funds being available. When benefits are increased, more households become eligible, resulting in greater expenditures which force us to again decrease benefits to remain within the appropriation.

g. These complications force projection based on [past] needs and population rather than on [actual] caseload. . . .

Foster testified that the planning office computes the reduction in benefits. Considering that adjustments of the payment amount takes two months, Foster admitted that DHS had set payments below total appropriations in order to maintain an administrative safety net.

On April 21, 1997, the circuit court issued an order granting Chandler's motion to dismiss, evidently pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In its order, the circuit court found that DHS (1) had "complied with all the legal requirements in the calculation of [Foytik's] benefits," and (2) was "appropriately conservative in its methodology of determining benefits." Judgment was entered against Foytik the same day.

On May 1, 1997, Foytik moved "to amend judgment to include reasoned decision," requesting that the circuit court "clarify what, specifically, the decision is, and on what grounds it was rendered." On June 2, 1997, the circuit court denied Foytik's motion to amend the judgment.

Foytik timely appealed from the April 21, 1997 order granting Chandler's motion to dismiss and the June 2, 1997 order denying Foytik's motion to amend the judgment.

4. The circuit court's April 21, 1997 order granting Chandler's motion to dismiss reads in pertinent part:

Defendant [Chandler], by and through her attorneys, . . . and [Foytik], Plaintiff Pro Se, appeared on December 13, 1996, January 31, 1997, February 28, 1997, and March 7, 1997[,] before the Honorable Riki May Amano for Defendant [Chandler's] Motion to Dismiss Declaratory Judgment Complaint.

## II. STANDARD OF REVIEW

■ The circuit court apparently dismissed Foytik's complaint pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 12(b)(6) for failure to state a claim upon which relief can be granted. HRCP Rule 12(c) (1996) provides, however, that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56[ ]. . . ." Numerous memoranda, affidavits, exhibits, testimony, and oral arguments, both in opposition and support of Chandler's motion to dismiss, were proffered by the parties, none of which were excluded by the circuit court. Furthermore, the circuit court's order indicates that the circuit court considered these submissions in reaching its determination.[4] We therefore treat Chandler's motion to dismiss as seeking summary judgment pursuant to HRCP Rule 56 and apply the standard of review relating to motions for summary judgment. See, e.g., State by Bronster v. United States Steel Corp., 82 Hawai'i 32, 38–39, 919 P.2d 294, 300–01 (1996) (motion to dismiss treated as motion for summary judgment, even though motion was styled as a motion to dismiss, where numerous supporting materials were presented in support of motion and materials were not excluded by court).

■ Accordingly,

[w]e review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 104, 839 P.2d 10, 22, reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated,

Upon consideration of the record, and the arguments presented[ ]. . . .

. . . .

. . . IT IS HEREBY ORDERED AND DECREED THAT Defendant [Chandler's] Motion to Dismiss Declaratory Judgment Complaint is granted.

(Emphasis added.)

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law.

*Id.* (emphasis added) (citation and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted). *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

### III. *PRINCIPLES OF STATUTORY CONSTRUCTION*

■ "We interpret statutes *de novo.*" *Keliipuleole v. Wilson,* 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (citing *Shimabuku v. Montgomery Elevator Co.,* 79 Hawai'i 352, 357, 903 P.2d 48, 51 (1995)). "[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself." *Kawamata Farms, Inc. v. United Agri Products,* 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997) (some brackets in original) (quoting *State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied,* 78 Hawai'i 474, 896 P.2d 930 (1995)).

Although the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction, does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citations, brackets, internal quotation marks, and ellipses points omitted).

### IV. *DISCUSSION*

#### A. *Foytik's Claims are not Barred by Res Judicata.*

■ Prior to addressing Foytik's contentions on appeal, we first discuss Chandler's claim that the present suit is barred by the doctrine of res judicata.

This court has consistently recognized that:

The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided.

*Morneau v. Stark Enters., Ltd.,* 56 Haw. 420, 422–23, 539 P.2d 472, 474–75 (1975) (quoting *Ellis v. Crockett,* 51 Haw. 45, 55, 451 P.2d 814, 822 (1969) (quoting *In re Bishop's Estate,* 36 Haw. 403, 416 (1943))[] ].

In *Morneau,* we also commented on the implications of the doctrine of collateral estoppel:

Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies.... Collateral estoppel also precludes relitigation of facts or issues previously determined when it is raised defensively by one not a party in a prior suit against one who was a party in that

suit and who himself raised and litigated the fact or issue.

56 Haw. at 423, 539 P.2d at 475 (citations omitted). These principles are tempered only by the prerequisite that a plaintiff have a full and fair opportunity to litigate the relevant issues. *See Morneau,* 56 Haw. at 421–22, 539 P.2d at 474; *see also Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (noting a long recognized exception that "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case").

*Pele Defense Fund v. Paty,* 73 Haw. 578, 599–600, 837 P.2d 1247, 1261 (1992) (some citations omitted), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993).

■ In *Morneau,* this court established a three-pronged test to determine whether the doctrine of res judicata (or collateral estoppel as an included doctrine) bars relitigation of an issue. Res judicata will bar relitigation where (1) the issue decided in the prior adjudication is identical with the one presented in the action in question, (2) there was a final judgment on the merits, and (3) the party against whom res judicata is asserted was a party or in privity with a party to the prior adjudication. *Morneau,* 56 Haw. at 424, 539 P.2d at 475.

Chandler argues that "Foytik's challenge to H.A.R. sections 17–678–17 through 17–678–19 should ... have been brought in the First Circuit Court action *Does,*" the litigation in which Foytik intervened as a party. Applying *Morneau* to the instant case, however, it is clear that the test for res judicata has not been satisfied. Notwithstanding that Foytik intervened as a party to the litigation in *Does* and that the issues herein could have arguably been raised therein, a final judgment on the merits was never rendered in that case. Given that the second prong of the *Morneau* test has not been satisfied, we hold that Foytik's claims in the present case are not barred by the litigation in *Does v. Chandler,* Civ. No. 95–4583–12, based on the doctrine of res judicata.

**B.** *DHS Provided Adequate Notice Under the HAPA Regarding Its Proposed Amendments to HAR §§ 17–678–17 TO 17–678–19.*

We have held that administrative rules not promulgated in accordance of the HAPA are invalid and unenforceable. *See, e.g., Burk v. Sunn,* 68 Haw. 80, 83, 705 P.2d 17, 20–21 (1985). Moreover, in a declaratory judgment action challenging the validity of administrative rules, "[t]he court shall declare the rule invalid if it finds that it violates constitutional or statutory provisions, or exceeds the statutory authority of the agency, or was adopted without compliance with statutory rulemaking procedures." HRS § 91–7(b) (1993).

■ Foytik and amicus curiae Legal Aid Society of Hawai'i (amicus curiae) assert that HAR §§ 17–678–17 to 17–678–19 are invalid inasmuch as DHS failed to provide proper notice of public hearing regarding the promulgation of such rules, in violation of the HAPA. Specifically, amicus curiae argues that DHS's notice of the proposed amendments was deficient because "the notice predated the effective date of the legislation authorizing the rule change by nearly four weeks (27 days), and predated the adoption of the Act by 10 days." Neither Foytik nor amicus curiae attacks the substance of DHS's notice.

In regards to notice, the HAPA provides in pertinent part that:

**Procedure for adoption, amendment or repeal of rules.** (a) Prior to the adoption of any rule authorized by law, or the amendment or repeal thereof, the adopting agency shall:

(1) *Give at least thirty days' notice for a public hearing.* The notice shall include:

(A) Either:

(i) A statement of the substance of the proposed rule adoption, amendment, or repeal; or

(ii) A general description of the subjects involved and the purposes to be achieved by the proposed rule adoption, amendment, or repeal; and

(B) A statement that a copy of the proposed rule to be adopted, the pro-

posed rule amendment, or the rule proposed to be repealed will be mailed at no cost to any interested person who requests a copy, together with a description of where and how the requests may be made; and

(C) The date, time, and place where the public hearing will be held and where interested persons may be heard on the proposed rule adoption, amendment, or repeal.

The notice shall be mailed to all persons who have made a timely written request of the agency for advance notice of its rulemaking proceedings, and published at least once in a newspaper of general circulation in the State for state agencies and in the county for county agencies.

HRS § 91–3(a) (1993) (emphasis added).

As indicated previously, DHS published notice of its intent to hold public hearings on proposed amendments to HAR §§ 17–678–17 to 17–678–19 on June 4, 1995. Public hearings were held *thirty-one* days later, on July 5, 1995, and the amendments to HAR §§ 17–678–17 to 17–678–19 were promulgated on July 24, 1995. Act 166—enacted June 15, 1995, and effective July 1, 1995—provided statutory authority under HRS § 346–71 for the DHS's new rules.

Notwithstanding that DHS complied with the plain language of the HAPA by providing "at least thirty days' notice for a public hearing," amicus curiae contends that:

[I]t is axiomatic that agency rule-making authority arises from a legislative grant of power. Absent legislative authority, an agency has no power to act. *Stop H–3 Association v. State*, 68 Haw. 15[4], 161, 706 P.2d 446 (1985). In this case, when on June 4, 1995, DHS noticed the public of its intent to adopt a rule giving itself the authority to set the general assistance allowance, existing law specifically reserved that power to the legislature. Act 166 granted DHS authority to set general assistance benefits, but the Act did not take effect until July 1, 1995. Only thereafter did DHS have the power to initiate a rulemaking effectuating the legislature's intent in Act 166.

Arguing policy, amicus curiae asserts further that "a 30 day notice that begins prior to the effective date of the authorizing statute seriously impairs the public's right to participate."

In our view, the contentions of Foytik and amicus curiae are unpersuasive. As stated previously, DHS provided the public with thirty-one days' notice, thereby complying with plain language of the HAPA. Notwithstanding that DHS's notice was published prior to the enactment of the authorizing statute, DHS's new rules were promulgated on July 24, 1995, more than three weeks after the effective date of the authorizing statute.

Moreover, nothing in the HAPA or case law requires that notice of public hearings on proposed amendments be published only after the effective date of the statute authorizing such amendments. "The express legislative objective of the HAPA rule-making procedures is to provide for public participation in the rule-making process, by allowing any interested person to petition for a change in the rules as well as to participate in a public hearing." *State v. Rowley*, 70 Haw. 135, 137–38, 764 P.2d 1233, 1235 (1988) (citing Hse. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 655). Certainly, this objective was met herein where the only point of contention is that notice was purportedly premature; as noted previously, the substance of the notice accorded by DHS is not being challenged in any respects. We therefore hold that DHS provided adequate notice under the HAPA of its intent to hold public hearings on proposed amendments to HAR §§ 17–678–17 to 17–678–19.

C. *HAR §§ 17–678–17 to 17–678–19 Fail to Establish a Method for Determining General Assistance Amounts, in Violation of the Statutory Mandate of Act 166, HRS § 346–71(f).*

 Act 166, as promulgated in the HRS, provides in relevant part that:

(f) Within the limitations of this section, *the department shall by rules adopted pursuant to chapter 91,* determine:

(1) The allowance for general assistance based upon the total amount appropriated for general assistance;

(2) *A method for determining assistance amounts;* and

(3) Other necessary provisions to implement general assistance.

HRS § 346–71(f) (Supp.1996) (emphases added).

Although recognizing that Act 166 granted DHS authority to set GA benefit levels, amicus curiae points out that "[t]he legislature's grant of authority ... was not a conveyance of unbridled discretion." Inasmuch as HAR §§ 17–678–17 to 17–678–19 fail to establish a method for determining assistance amounts, Foytik and amicus curiae assert that the rules stand in violation of the statutory mandate of Act 166, specifically HRS § 346–71(f). According to Foytik,

> [t]he department's adopted rules are so much window dressing: they state no method for determining benefit amounts. They are dummy rules—straw rules— which obscure the reality that the department exercises its discretion withdrawn from any public participation. There is no method stated in a rule to determine general assistance benefit amounts.

Chandler, on the other hand, relies upon Senate Standing Committee Report No. 1609, in the 1996 Senate Journal, at 825, which states in pertinent part that Act 166 was intended to confer "discretionary flexibility to the DHS to determine the allowance for general assistance based on the total amount appropriated for general assistance." Citing also to Foster's declaration, Chandler further contends that DHS intended "that HAR §§ 17–678–17 to 17–678–19 [serve to] explain how benefits are calculated for the GA program." Thus, according to Chandler, "reading both the Standing Committee Report No. 1609 and Ms. Foster's declaration together, it is clear that the H.A.R. sections in question are rules which implement H.R.S. section 346–71(f)."

We reject Chandler's assertions and agree with Foytik and amicus curiae. As stated previously, HRS § 346–71(f) provides that "the department *shall by rules adopted pursuant to chapter 91,* determine[ ] ... *[a] method for determining assistance amounts[.]*" (Emphases added.) Read plainly, HRS § 346–71(f) expressly dictates that DHS establish a method for determining GA amounts by rules adopted pursuant to the HAPA. Inasmuch as HRS § 346–71(f) is couched in mandatory terms, there can be no question that DHS's authority to set GA benefit levels was not intended to be absolute.[5]

The legislative history to Act 166 is instructive. According to the Senate Conference Committee Report on S.B. No. 1683, which resulted in Act 166:

> The purpose of this bill is to clarify the requirements for receiving general assistance for those physically and mentally impaired and to provide for lump-sum budgeting for general assistance.
>
> Your Committee is aware that the United States Congress is moving toward initiating block grants to the states as its share in funding financial assistance and other programs.... Your Committee believes that it is prudent to plan ahead for the coming of block grants by providing for lump-sum budgeting. Your Committee is aware of the practical inequities inherent in lump-sum budgeting since it would mean that the Department of Human Services would have to serve the same number of individuals, more or less, with less money. However, the realities of the situation call for prudent planning notwithstanding the possibility of resulting inequities.
>
> *This bill allows the Department of Human Services to determine the allowance for general assistance based upon the total amount appropriated for general assistance, among other relevant factors. In conformity with that, this bill also allows the Department of Human Services to adopt rules to establish qualifying guide-*

---

**5.** Indeed, we recognize that a legislative grant of absolute authority to DHS of the former's plenary power to adjust GA benefits would, in itself, raise a constitutional problem regarding proper separation of powers.

318

*lines and priorities for general assistance and a method of determining general assistance.*

Your Committee believes that the Department of Human Services should be authorized to adopt rules to determine the allowance for general assistance based upon the total amount appropriated for general assistance and to establish guidelines and priorities for assistance....

Sen. Conf. Comm. Rep. No. 90, in 1995 Senate Journal, at 797–98 (emphasis added). *See also* Hse. Stand. Comm. Rep. No. 1171, in 1995 House Journal, at 1475 (stating that DHS is required "to adopt rules establishing qualifying guidelines and priorities for general assistance, as well as a method for determining assistance amounts").

Although the legislature intended to provide DHS with some flexibility [6] in setting GA benefit amounts, the above legislative history clearly reflects an intention that the DHS would nevertheless be required, under Act 166, to establish its method for determining GA benefit amounts via rules promulgated under the HAPA. The record reflects that the DHS has failed to abide by this statutory mandate.

According to Webster's Third New International Dictionary (1967), a "method" is defined in pertinent part as "a systematic procedure, technique, or mode of inquiry employed by or proper to a particular science, art, or discipline[;]" "a way technique, or process of or for doing something[.]" *Id.* at 1422–23. HAR §§ 17–678–17 to 17–678–19, however, simply and generally provide that, in order "[t]o avoid an expenditure of funds beyond those appropriated by the legislature for the GA Program," DHS may suspend, cancel, or reduce benefits. *See* HAR § 17–678–18(a). Nowhere does HAR §§ 17–678–17 to 17–678–19 specify or explain the method or technique by which DHS determines GA benefit levels. Rather, in the event of a reduction in GA bene-

fits, HAR § 17–678–18(b) states only that "benefits shall be reduced by reducing the standard of assistance for each household size by the same percentage." Additionally, HAR § 17–678–19(a) provides in relevant part that "the department shall take immediate action to effect the reduction for the affected month, without a public hearing, by: (1)[m]aking necessary computer adjustments; (2)[r]eproducing the benefit amounts as determined by the director and distributing these tables to the issuance staff; and (3)[e]nsuring that all households ... receive a minimum benefit of $10...." Although these provisions may explain the procedure by which DHS *implements* a reduction of GA benefit levels, they clearly fail to explain how DHS *determines* the reduction of GA benefit amounts in the first instance. Indeed, completely absent from HAR §§ 17–678–17 to 17–678–19 is any reference to the method Foster stated was being used by DHS to set GA benefit amounts.

Chandler remarks that "[t]here is nothing in either Act 166 or H.R.S. section 346–71(f) that requires H.A.R. sections 17–678–17 through 17–678–19 to specify the method for determining assistance amounts and the allowance for general assistance." This suggestion is specious. Apparently, Chandler would have this court hold that, based on Act 166 and HRS § 346–71(f), DHS was authorized to promulgate rules, reserving unbridled discretion to itself, to reduce, suspend, or cancel benefits, its method for determining benefits being forever free from public scrutiny or comment. Had the legislature intended to afford DHS such unbridled discretion, however, it would not have expressly required that DHS establish a method for determining GA benefit levels by rules promulgated pursuant to the HAPA. Inasmuch as Chandler's interpretation of the Act would render such language superfluous, we dismiss her contention.

**6.** Senator Matsuura, speaking in favor of S.B. No. 1683, stated in a floor speech that:
What this bill does is provide flexibility. It is true that the federal government is planning to give all the states block grants. What we are trying to do is to get ready for that. This bill provides some flexibility within the Depart-

ment of Human Services so that the benefits can be altered to meet whatever monies they have to operate with. This is, in essence, the reason for this bill and also to provide some guidelines.
1995 Senate Journal, at 669.

"It is axiomatic that an administrative rule cannot contradict or conflict with the statute it attempts to implement." *Hyatt Corp. v. Honolulu Liquor Comm'n,* 69 Haw. 238, 241, 738 P.2d 1205, 1206–07 (1987) (quoting *Agsalud v. Blalack,* 67 Haw. 588, 591, 699 P.2d 17, 19 (1985)); *see also State v. Feldhacker,* 76 Hawai'i 354, 356, 878 P.2d 169, 171 (1994). As stated previously, "[t]he court shall declare [an agency rule] invalid if it finds that it violates constitutional or statutory provisions, or exceeds the statutory authority of the agency, or was adopted without compliance with statutory rulemaking procedures." HRS § 91–7(b). *See Hyatt Corp.* at 240, 738 P.2d at 1206 (providing that an agency rule is void and cannot be enforced if its adoption was not authorized by statute). Considering that (1) HAR §§ 17–678–17 to 17–678–19 fail to set forth the method by which DHS determines GA amounts, and (2) it is undisputed that the method used by the DHS to determine GA amounts, as described by the testimony of Foster, was adopted without compliance with the HAPA, we hold that HAR §§ 17–678–17 to 17–678–19 contravene the statutory mandate of Act 166, specifically HRS § 346–71(f), and are therefore void and unenforceable.

## V. CONCLUSION

For the foregoing reasons, we vacate the April 21, 1997 judgment and order granting Chandler's motion to dismiss Foytik's complaint. In light of our holding that HAR §§ 17–678–17 to 17–678–19 are invalid and unenforceable, it is unnecessary for us to address Foytik's remaining claims that (1) HAR §§ 17–678–17 to 17–678–19 violate due process by failing to provide for a public hearing when DHS effects a reduction in monthly benefits, and (2) the actual allowances set by DHS were arbitrary and capricious. Accordingly, we remand this case to the circuit court for further proceedings not inconsistent with this opinion.